Cunningham, Presiding Judge.
On the 17th day of December, 1908, plaintiff was injnred by a car of the defendant company running over his right foot and leg, so injuring that member as to require amputation. On September 3, 1909, plaintiff filed -his amended complaint, on which the case was tried, in the district court against appellant and the Golden Cycle Mining Company. On the trial he dismissed his suit as to the latter defendant. The jury awarded plaintiff a verdict of $5,000. The record discloses the following facts: The Golden Cycle Mining Company owns a reduction works at or near Colorado City, and in close prox *352 unity to tlie main line of the appellant company. The Golden Cycle Company had laid a spnr track connecting its reduction works with the main line of appellant’s railway, said track being the sole property of the Golden Cycle Company. It was the custom of appellant to run its ears and engines over these spur tracks for the purpose of switching cars of ore consigned to the Golden Cycle Company into the yards of said company, and placing such cars as directed by the Golden Cycle Company. On the morning of the 17th of December, and immediately before the accident, Edwards, who was an ore shoveller in the employ of the Golden Cycle Company, emerged from an ore bin or chute which was located beneath the surrounding surface. One or two cars belonging to the defendant company stood at the mouth of the ore chute from which plaintiff emerged. These cars were entirely disconnected from any train or engine. The opening of the ore chute through which Edwards reached the surface was located very near to- the end of one of these cars, and, as he straightened up after clambering upon the platform, his body appears to have been in the line of these cars. At any rate, an engine propelling one or more cars, and coming from the west, struck the end of one of the cars, opposite from the end where Edwards was, and shunted the disconnected car over plaintiff’s limb, resulting in the damages sued -for.
1. One of the contentions of the defendant is that while its switching crew was operating in the yards of the Golden Cycle Company, it was not in the employ of the railroad company. This contention is based upon the theory that the railroad company simply loaned its switching crew and equipments to the Golden Cycle Company whenever the latter company desired work done in its yards which required such crew and equipments, hence, it is contended by appellant, if there was any liability to *353 the appellee in this case the Golden Cycle Company, and not the railroad company, must respond. We cannot yield assent to this contention. The switching crew consisted of an engineer, a fireman, two brakemen or switch-men, and a switching boss or foreman. All of the equipment used by this crew was the property of appellant, and the.crew was on its payrolls. It is true the evidence discloses that while switching ore cars and doing work of that sort upon the premises of the Golden Cycle Company the crew acted under the direction of that company, to the extent of placing and moving cars pursuant to a switching list furnished by the representatives of the Golden Cycle Company. But we are persuaded that this is not sufficient evidence to warrant us in holding that the switching crew was loaned by the railroad company to the mining compány, and that the' said crew pro haec vice became the employes of the latter company. Authorities are cited by appellant to support this contention, but we are convinced by a careful reading of them that; in most instances at least, the facts involved in this case and the facts upon which the cases cited by counsel for appellant turn are so substantially different as to make these authorities inapplicable. Take, for instance, the case of Sexton v. New York Central Co., 114 App. Div., 678, 99 N. Y. S., 1111, which counsel for appellant asserts is closely in point, and from which he quotes at length: it appears in that case that the engine of the railroad company had been employed in the yards- of a foundry company exclusively for some weeks prior to the accident; that in the operation of its business at the time of the accident the foundry company employed two engines, one of which belonged to it, and the other to the New York Central railroad; that “the crew, although hired and paid by the defendant (the railway company), were under the direction of the then foreman of the Corrigan Company, to whom they re *354 ported in the morning, and to whom they looked for all instructions in regard to the work each day. ’ ’ The record in this case discloses no such state of facts. It was the custom of the switching crew of the railroad company to go upon the premises of the reduction works and do whatever switching was required to be done, so as to complete it, if possible, by eight o’clock in the morning, but there is nothing in the record to indicate that the reduction company had any authority to order the switching crew when to appear, or when to cease its work of switching in its yards; there is nothing to indicate that there was an officer of that company known as a “yard foreman;” the reduction company, so far as the evidence indicates, had no engine of its own, but relied entirely upon the railroad company for such work. Moreover, it appears conclusively that the reduction company; not under rules and regulations formulated by that company, but under the general rules and regulations formulated by its employer, the railroad company, and precisely as the crew operated when in the yards of the railroad company. We quote the following from the testimony of witness Russell, the engineer, who was in charge of the switch engine at the time of the accident:
“I have a book of rules of the company in regard to the signals that should be given. (It is evident from what follows and from the admissions of counsel for appellant in the brief that the witness here refers by the use of the word ‘company’ to the railroad company.) Before going to work switching in the Golden Cycle Mill I was required to sign a schedule of rules. (Referring to the book in his possession.) This one. This is the only one that I had to sign. There is nothing in the set of rules regulating the signals that must be given in entering an ore house where men are at work. There is no rule, in the book of rules' by which I am working for the Colorado Midland, at any one place for any one movement in any place; in the *355 Golden Cycle Mill, or anywhere else. I work only under the direction of the company at all times; both on the road and at places of that kind. There were no rules especially belonging to this particular place where the accident occurred. (Which was on the premises of the Golden Cycle Company.) Before backing the cars into the ore sheds the rule requires me to ring the bell. ’ ’
Witness is here referring to rules furnished him by the railroad company. The supreme court of New York, in the Sexton case, supra, lays stress upon the fact that the employment of the engine and crew of the railroad company in the yards of the foundry company was permanent, and, commenting upon the exclusiveness of the foundry company’s control over the crew, uses this lan'guage:
“The defendant, for the period in which it loaned the use of its engine and crew, surrendered the entire control of its employes to the Corrigan Company. The railroad company could not, during such use, direct its employes as to the manner in which the work for the Corrigan Company should be performed, or make rules and regulations for their guidance. These were things entirely within the charge and control of the foreman of the Corrigan Company directing the work and the manner in which it should be performed.”
[The italics are ours.]
Witness E. F. Smith, manager of the reduction mill operated by the mining company, testified as follows■
“When cars were placed in the mill by the Colorado Midland Railway Company the transportation line controls the movement of the cars. The mining company has nothing to do in the exercise of any control over the movements of the cars in the ore shed beyond the giving of instructions as to how they desired the cars to be brought in. * * * In the process of setting ears they would be under the exclusive charge of the trainmen.”
*356 On cross-examination, apparently conducted by counsel for appellant, the following questions were propounded to this witness, and the following answers made:
“Q. What do you do to designate that you want car number so and so, or car number something else, to be put in this place for unloading?
“A. We give them a schedule.
“Q. You give them a schedule and there your authority ceases ?
“A. Yes. sir.”
Witness Sonnichsen, engine foreman for the Colorado Midland Railway Company, who had charge of the switching crew at the time of the accident, was called by defendant, and, among other things, testified as follows:
“I was at the Golden .Cycle mill on the morning of December 17th, the morning Mr. Edwards was hurt. I was superintending the movements of the switch engine in regard to setting the ore for the mill people. The movements that the engine made were under my direction. I received my instructions indirectly from the yard master. I was furnished with a switch list with the numbers and initials of the cars, and with that list I used my judgment in placing the cars.”
On cross-examination this witness testified as follows :
‘ ‘ T considered that I was foreman of the train and had charge of its movements. I was in the employ of the Colorado Midland Company.”
We are not advised by anything in the record concerning the arrangements which existed between the railroad company and the reduction company with reference to the compensation of the former for performing the work in the yards of the latter. The mere fact that the reduction company handed to the switching crew a switching list, indicating where it desired cars set, would not in and of itself be sufficient to change the status of the *357 switching crew from that of employes of the railroad company to employes of the reduction company. All work done by the railroad company for the reduction company, whether in the yards of the latter, or in the yards and upon the main line of the railroad company, is, in a sense, done under the direction of the reduction company; that is to say, it is done pursuant to a request emanating from the reduction company. Indeed, all work done by a railroad company for its patrons is ordinarily done under such direction, since it rarely engages in hauling or moving freight belonging to itself, but usually is employed in moving and handling the property of others.
2. The appellant insists that it was guilty of no negligence, and contends that the plaintiff was guilty of contributory negligence. A consideration of these two questions necessitates a somewhat fuller statement of the facts surrounding the accident than that which has already been given.' At the time of the accident the plaintiff had been in the employ of the Golden Cycle Company as an ore shoveller for- a period of about seventeen days. A part of his duties required that he go down into certain ore bins situate below the surface, and in close proximity to the switch track in question. On the morning of the accident he began his work at eight o ’clock. He testified that during the time he had been employed with the reduction company he had never known the railroad company to do switching after eight o’clock in the morning. The foreman of the switching crew insisted that it was not unusual for a crew to do switching in the yards of the reduction company after eight o’clock in the morning, and he testified:
“It was a usual thing to be working around there near eight, or varying either way a few-minutes from eight o ’clock. ’ ’
On cross-examination the switch foreman testified:
“It was customary to set the cars in on the east track *358 as near eight o’clock as we could. We always tried to have the work completed before eight o’clock, but it was not an unusual thing to be working around there after eight o’clock. It was expected of the railroad company to have cars set over the ore bins so that the men could go in those cars and go to work at eight o’clock. We did that as near as we could, but it was a very frequent occurrence for cars to be run over the ore bins and back and forth after eight o’clock.”
At the time of the accident the switch engine was coming from a westerly direction towards the ore bin where appellee was working. It was pushing one or more cars ahead of it. The car which came in contact with the body of plaintiff was standing, as we have said, disconnected from the engine, immediately before the accident. None of the employes of the railroad company were in a position where they could see plaintiff as he emerged from the ore bin, yet from what has already been said, it is clear that the switching crew knew that at or about eight o’clock (and the accident occurred a few minutes after eight) ore shovellers were likely to be working in and about the ore bins. The question is: was it the duty of the employes .of the railroad company under the circumstances here disclosed to give warning of some kind that its engine was approaching the ore bin, where it was at least probable employes of the reduction company might be at that time of day working, and in a position of great peril? Clearly, we think this question must be answered in the affirmative, hence it follows that if the railroad company did not give warning of the approach of its engine, it failed to discharge its plain duty in that behalf, and was guilty of negligence, and is liable for any damage which was proximately occasioned the plaintiff by such negligence, unless, of course, the plaintiff himself was guilty of negligence contributing directly to the cause of his injury.
*359 This brings ns to a consideration of an important feature of this case, viz.: whether the railroad company did or did not give warning of the approach of its engine. It is asserted on behalf ,of. plaintiff that no warning of any kind was given, while it is stoutly contended on behalf of appellant that the bell was rung continually from the time the engine started eastward until it struck the car which inflicted the injury of which plaintiff complains. The testimony of plaintiff on this point is that he, the plaintiff, did not hear the bell ring, and he could have heard it if it had been rung. Morris Harvey, a witness for plaintiff, testified that he did not hear the bell ring, and that he was about twenty feet from the engine. John Doysick, a fellow-laborer, who came out of the ore bin immediately ahead of the plaintiff, and but a moment before the accident, testified that he did not hear the bell ring. John Mascow, a witness for plaintiff, who'was standing nearby, did not hear the bell ring, and the foreman of the defendant’s switching crew testified that he had no recollection of hearing the bell ring, although it is admitted in the brief of appellant that he was, with the exception of the engineer and fireman, probably in the best position to hear the ringing of the bell. Appellant insists that this testimony, being largely negative in its character, is so untrustworthy that it must give way before the positive and. direct testimony of the fireman and engineer, who stated positively that the bell was ringing at the time of the accident. In support of this contention,, counsel cites the following federal cases: Dunlop v. United States, 165 U. S., 486, 41 L. Ed., 799, 117 S. C. Rep., 375; Rich v. Chicago Ry. Co., 149 Fed., 79, 78 C. C. A., 663; Chicago & N. W. Ry. Co. v. Andrews, 130 Fed., 65, 61 C. C. A., 399. Because of the dissimilarity in the facts involved, these federal cases are not controlling. In the Bich case (we quote from the syllabus) it is,
“HELD, that the evidence of witnesses who were not *360 paying attention to the engine at the time, and were not necessarily in a position to have heard any bell ring or whistle sound before the accident, that they heard neither bell nor whistle is insufficient to constitute a substantial conflict and warrant a finding that there was negligence in failing to ring the bell or sound the whistle.” [Italics ours.]
The rule contended for by appellant, and which we are now considering, is to the effect that the testimpny of a witness who testifies to an affirmative should be preferred to that of a witness who testifies to a negative. Commenting on this rule, Judge Adams, in the Eich case, warns against its broad and unrestricted application, saying:
“"While the foregoing rule is a valuable one to prevent speculative and unwarranted verdicts, and should be fearlessly applied in appropriate cases, no liberty should be taken by the trial judge under its supposed protection to waive the force or value of evidence which is substantially uncontradicted. "Where ‘circumstances attending the failure to notice an occurrence are such as to afford reasonable ground to believe that if the occurrence had happened it would have been noticed by the witnesses, the failure to notice it may be and frequently is some evidence that it did not occur, and should go to the jury for its consideration.’ ”
Indeed, it would seem that in many, if not most, cases where witnesses are attempting to testify that a bell did not ring or a whistle blow, they can only say, “I did not hear.” If the rule contended for here by the railroad company be adopted without qualification, then it would become extremely difficult, if not impossible, for a plaintiff who relied on a lack of warning signals designed to appeal to the ear only, to make out a case of negligence. The difference in the weight to be given to the affirmative testimony of a witness who says: “I heard the bell ring, ’’ *361 and the weight which should be given to another witness standing in a position equally favorable for hearing, who says: “I did not hear the bell ring,” is not so great, perhaps, as has sometimes been supposed.
It would unduly prolong this opinion for us to analyze the Andrews case, supra, but a casual examination of the syllabus discloses how overwhelming the testimony in that case was against the contention of the plaintiff therein. From the syllabus we quote the following:
“The engineer testified that he saw plaintiff apparently about to cross the track, and gave two alarms. Eighteen end of nineteen witnesses for both parties also testified that they heard such a whistle. A number of other parties testified that they looked-along the track westivard and plainly saw the approaching train, while there was no testimony except plaintiff’s that the view was obstructed.”
And yet, in the face of such a record, Judge Thayer writes a vigorous dissenting opinion, in the course of which he says: •
“The majority of the court says that in view of the situation the plaintiff’s testimony ‘is entitled to no credence and does not create a conflict of evidence, for which reason it should have been disregarded and the jury directed to find a verdict in favor of the defendant.’ I do not concur in that view. I think that this court has no right to disregard the plaintiff’s testimony, and that it cannot do so without usurping the functions of the jury. In this class of eases there may be things happen that the testimony of a witness that he looked in a given direction and did not see an approaching train is so far at variance with the facts of the situation as-to justify a court in disregarding it, because if he looked he must have seen it. The case at hand is not of that kind. * * * At all events it was the function of the jury .to say whether he acted with ordinary prudence, or should have waited *362 longer until the smoke cloud floated away, and studied the situation more carefully. On the whole, therefore, I conclude that it cannot be said that twelve reasonable men listening to the testimony contained in this record must have found that the plaintiff testified falsely, and that he went on the track heedlessly, without looking to the west or listening. Twelve jurors acting under proper instructions have in fact found the contrary of this contention, and this court should not reverse that finding if the right of juries to determine issues of fact is to be further respected.”
We think the rule laid down by Judge Thayer in the dissenting opinion more clearly accords with the rule which obtains in this state, established by the decisions of our supreme court, than does the majority opinion in either of the three federal cases cited by appellant. See Phillips v. Denver Co., 53 Colo., 458, 128 Pac., 460; Williams v. Sleepy Hollow Co., 37 Colo., 62, 86 Pac., 337, 7 L. R. A. (N. S.), 1170, 11 Ann. Cas., 111.
Moreover, the jurors were the proper judges of the credibility of the witnesses who appeared before them, and it may well be that the responsibility of the fireman and engineer on the switch engine (the only witnesses out of a switching crew of five men who testified that the bell was rung), for the accident in question, and their demeanor on the stand while giving their testimony, justified the jury in disregarding their evidence. Applying the rule laid down by the supreme court of Colorado to the evidence in this case we are of opinion that there was sufficient evidence of negligence on the part of appellant to warrant the submission of the question to the jury.
3. We will next consider whether under the evidence the trial court should not have determined, as a matter of law, that the plaintiff was guilty of contributory negligence, and, for that reason, taken the case from the jury. The plaintiff testified that directly upon emerging from *363 the ore bin through the chute to the platform, and before straightening himself up so as to bring his body in a position where it could be struck by the car standing by the chute in the event said car was moved :
“I stopped and looked back towards the east, for I expected those cars to come that way. I didn’t know, and I stopped and turned round to the west and stood there an instant. (The engine was coming from the west.) I did not observe any cars in motion anywhere. I did not see any person. There was no brakeman on that car which I saw (evidently meaning the stationary car near the mouth of,the ore bin). I did not hear the sound of any whistle or any bell. ’ ’
On cross-examination plaintiff was asked this question:
“Consequently, you did not look to the west to see whether there was any car coming; you only looked in one direction? A. I looked all round, both ways.”
And, again, on cross-examination, he testified:
“My glance in the direction in which the car was coming was only for an instant. I did not see any car coming’. ’ ’
There was testimony to the effect that a pile of ore was lying near the mouth of the bin between where plaintiff stood and the approaching engine which would at least tend to shut off his view. Applying the rule laid down in Phillips v. Denver Company, supra, we think the evidence just quoted, and other facts already alluded to, makes the question of contributory negligence one for the jury.
4. The only remaining question which demands our consideration pertains to the instructions. Much of appellant’s complaint going to the alleged errors of the trial court in the giving of instructions proceeds upon its theory, heretofore considered and disposed of, that the Golden Cycle Company was in control of the switching *364 crew, and upon its further contention, which we have declined to accept, that there was not sufficient evidence of negligence on the part of appellant to take the case to the jury. In this connection counsel for appellant, with commendable frankness, say:
“Unquestionably it would be negligence' on the part of the trainmen to back a string of cars over the track near the ore bin without ringing the bell or giving any signal or alarm. -The part of the instruction submitting this question to the jury would, therefore, be unobjectionable if there were sufficient evidence to go to the jury upon the issue that the bell was not rung, and if, as a matter of law, the appellant, and not the Golden Cycle Mining Company, were pro hac vice the master of the train men and responsible for negligence at the time the accident occurred.”
The complaint charged several independent acts of negligence on the part of appellant, and the instructions of the trial court appear to have submitted to the consideration of the jury all of the various acts of negligence alleged in the complaint, whereas it is contended on behalf of the railroad company that as to many of the negligent acts charged in the complaint there was no supporting-proof whatever. We have already determined that there was sufficient evidence of negligence on the part of the railroad company, in not causing its bell to be rung, or in some other equally. effective manner giving warning- to the appellee of the approach of its train, to carry the case to the jury. If there were other acts of negligence charged against the defendant concerning which there was no proof whatever offered, it seems highly improbable that the jury would have based its verdict of guilty upon such wholly unsupported allegations, rather than upon an allegation concerning which there was ample evidence offered to support their verdict. While it was the duty of the trial court to withdraw from the considera *365 tion of the jury all allegations of negligence made in the complaint not supported by evidence, a corresponding duty rested upon the defendant to tender an instruction withdrawing such charges or issues, or in some other manner affirmatively directing the attention of the trial judge to his duty in this behalf. In this respect appellant, as well as the trial court, 'was remiss in its duty. But, for the reasons already stated, we are of opinion that there is nothing in the record to warrant the conclusion that the error of the trial court which we are now considering prejudiced the rights of appellant. It has been well said that not every error calls for a reversal of a judgment. To have this effect the error must appear to have been prejudicial to the party seeking to take advantage of it. — DeLappe v. Sullivan, 7 Colo., 182, 2 Pac., 926; Schoolfield v. Houle, 13 Colo., 394, 22 Pac., 781.
The courts of the state have repeatedly ruled that the burden of showing error is upon the appellant or plaintiff in error, and in order to secure a reversal of the judgment of which he complains prejudicial error must affirmatively appear in the record.-Kinsel v. Wieland, 38 Colo., 296-9, 88 Pac., 153; Stewart v. Schiffer, 43 Colo., 515-6, 96 Pac., 169; Stubbs v. Montezuma Co., 45 Colo., 219-221, 100 Pac., 433.
Moreover,,it is a matter of grave doubt (at least it is fairly debatable) whether under the record before us it is our duty to consider any question of error predicated upon the trial court’s instructions. The record does not disclose when appellant saved its exceptions to the instructions — whether before or'after the case had been submitted to the jury. The record on this point reads as follows:
“The defendant, the Colorado Midland Bailway Company, excepts to Instruction No.- 1 of the instructions given by the court to the jury,” etc.
Our appellate courts have frequently held that in *366 order to avail one who complains of the instructions of a trial court, his exceptions must be claimed in such time and manner as to afford opportunity to the trial judge to recede from his position as announced in the instruction objected to, if he chooses so to .do. — Taylor v. Randall, 3 Colo., 399; Dawson v. Coston, 18 Colo., 493, 33 Pac., 189; Denver Co. v. Ryan, 17 Colo., 98, 28 Pac., 79.
In Taylor v. Randall; supra, it is expressly ruled that “a bill of exceptions must be construed most strongly against the party who prepared it.” In Dawson v. Coston, supra, it is said:
“The second assignment of error is not tenable for the reason that it nowhere appears from the record that the instructions complained of were objected to in apt time. That this is necessary in order to obtain a review upon such ground is fully settled by this court in several cases.”
Citing many Colorado cases. We have examined the abstract of record in the Dawson case, and find therein the following statement:
“After introduction of evidence the following instructions were given the jury at the request of plaintiff, and over the objection of the defendant.” (The appellant in the Dawson case was the defendant below.)
If it be said that the appellee in the instant case has interposed no objection in this court to the consideration of the trial court’s instructions, we answer that we find no such objection in the brief of appellee in Dawson v. Coston. In Mann v. Dempster, 179 Fed., 837, 103 C. C. A., 325, the following is quoted from Phelps v. Mayer, 15 How., 160, 14 L. Ed., 643:
“It has been repeatedly .decided by this court, the supreme court of the United States, that it must appear by the transcript, not only that the instructions' were given or refused at the trial, but also that the party who complains of them excepted to them while the jury were *367 at the bar. * * * It (meaning the exception) need not be drawn out in form and signed before the jury retires; but it must be taken in open court, and must appear by the certificate of the judge who authenticated it, to have been so taken.”
Decided June 10, A. D. 1913.
Rehearing denied July 14, A. D. 1913.
The same case was again before the circuit court of Appeals, second circuit, and in the second opinion, which appears in 181 Fed., 76, 104 C. C. A., 110, the former ruling was not only upheld, but the court went further and ruled that exceptions to instructions reserved after the jury had retired could not be reviewed even though the adversary assented to such review.
Discovering no error in the record prejudicial to the substantial rights of appellant, the judgment of the trial court is affirmed.

Judgment Affirmed.